UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
KINOJUZ I.P. (a company under the laws of
Kazakhstan),

                              Plaintiff,

         - v -

IRP INTERNATIONAL INC., OULIAN
DOUBININE, and IGOR ERLIKH,

                              Defendants.
-----------------------------------------------------------------x

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

CV-11-299 (VVP)

POHORELSKY, Magistrate Judge:

On the basis of the admissions in the pleadings and the evidence offered at the trial of

this action, I make the following findings of fact and reach the following conclusions of law.

## FACTS

This action arises from the efforts of the plaintiff Kinojuz I.P. to obtain funding for

the production of a motion picture entitled "My Only." The plaintiff is a motion picture

production company based in Kazakhstan wholly owned by Zhorabek Musabayev. The

company was formed by Musabayev in 2000 and has produced at least five movies since

then. The defendant IRP International Inc. was a New York corporation which was

founded by the defendant Igor Erlikh.[1] Erlikh is a native of Ukraine and is a naturalized

citizen of the United States. The defendant Oulian Doubinine was at times relevant an

associate of Erlikh. He is a native of Kazakhstan who moved to the United States in 1996

and is a lawful permanent resident. The plaintiff was represented by counsel. The

defendants Erlikh and Doubinine represented themselves *pro se.* The defendant IRP was

dissolve on April 27, 2011, shortly after the lawsuit was filed, and has ceased to exist.

Musabayev estimated that the movie for which the plaintiff sought to obtain funding,

entitled "My Only," would require about $2 million to produce. In his effort to find

investors, he was introduced to the defendant Oulian Doubinine. Doubinine had worked in

---

[1]The owners of IRP were Erlikh and his son Peter. IRP has now been dissolved.

the movie industry in Kazakhstan before coming to the United States, and was purportedly involved in the movie industry in the United States. Doubinine and Musabayev first met in Almaty, Kazakhstan in May of 2007. During the meeting, Doubinine confirmed that he had good connections in the movie business in the United States, and told Musabayev that he had a billionaire business partner, the defendant Igor Erlikh, who could "multiply money." Doubinine said that if Musabayev was willing to transfer $1 million to Doubinine and Erlikh, they would turn it into $2 million. Although he mentioned the defendant IRP International Inc., and told Musabayev that the initial investment he made would go through IRP, he did not provide any details about the business of IRP.

Doubinine and Musabayev met again in late June or early July of 2007, this time in Shymkent, Kazakhstan where Musabayev resided.[2] They had wide-ranging discussions about various ventures, including the movie, as well as a project for importing goods that Erlikh held in the United States to be sold in Kazakhstan at a profit to generate money for the movie project. The goods included medical supplies as well as clothing and other necessities, destined to be used for humanitarian purposes. Musabayev declined to engage in the project to import goods as he was solely interested in the movie at that point.

As a result of their discussions, Doubinine prepared a handwritten contract which Musabayev presented to his attorney for review. After the attorney made some amendments, a typewritten version was prepared and signed by Doubinine, acting on behalf of IRP,[3] and by Musabayev, on behalf of Kinojuz. DX A.[4] The contract, which is dated July 1, 2007, called for a total budget not to exceed $3 million dollars, with Kinojuz to invest $800,000

---

[2]Doubinine was accompanied by an associate, Askar Akimovych, whose name arose in various testimony at trial, but whose relationship to the parties and to the movie project was never made clear.

[3]Doubinine signed the contract as the vice-president of IRP. There is no evidence that he actually held that title, but the defendants do not dispute that he was authorized by Erlikh to act on behalf of IRP.

[4]"DX" refers to the defendants' exhibits; "PX" refers to the plaintiff's exhibits; "Tr." followed by a date refers to the trial transcript on the date noted.

and IRP to invest $2.2 million. Kinojuz was to make an initial investment of $100,000 to be transferred to IRP by July 10, 2007, and a subsequent investment of $700,000 to be transferred to IRP by August 1, 2007. IRP was to make its investment of $2.2 million by November 1, 2007. The parties would share equally in all profits, after expenses. In contrast to what the defendants would later contend, the contract contained no suggestion that IRP would transfer goods to Kinojuz for sale in Kazakhstan in order to raise the necessary funds for IRP's investment.

Kinojuz did not meet its initial obligations to transfer funds to IRP in July and August as contemplated by the contract. Doubinine, who had prepared a timeline for production of the movie in the interim, see DX C, returned to Kazakhstan on or about August 10, 2007. He was accompanied this time by the defendant Igor Erlikh, whom he introduced to Musabayev for the first time, and the three of them held meetings over the course of two days. In their discussions, Erlikh claimed to have interests in gold mines and an insurance company, and also mentioned the humanitarian supplies that Doubinine had previously discussed with Musabayev. According to Musabayev, neither Erlikh nor Doubine advised Musabayev that Erlikh had been convicted of crimes including tax fraud and money laundering in the United States and was on supervised release after serving a multi-year term of imprisonment. Erlikh did not discuss any specifics concerning the movie with Musabayev during this meeting, leaving those matters to Doubinine.

They met again in Almaty a month later in September 2007, at which time Musabayev had extensive discussions with Doubinine and Erlikh about the movie project, the humanitarian supplies, and an insurance company that was to guarantee the plaintiff's investment. Doubinine and Erlikh urged Musabayev to transfer to IRP the $800,000 investment that the plaintiff was supposed to make. Although it was Erlikh's intention that the humanitarian supplies in his possession would constitute IRP's investment in the movie project, he and Doubinine did not disclose that to Musabayev. Rather, it appears that their plan was to use Kinojuz's $800,000 investment to pay for the humanitarian supplies that IRP

had already purchased, and then foist onto Musabayev the task of finding buyers for the goods in Kazakhstan in order to obtain IRP's investment in the movie.

There is no evidence that Musabayev ever agreed to such an arrangement. However, during this visit, Erlikh also met Musabayev's wife, a physician who was apparently interested in building a medical center and laboratory in Shymkent, Kazakhstan, and they had discussions about such an enterprise. Later communications between Musabayev and Erlikh by e-mail make it clear that Erlikh provided medical supplies or equipment, or both, to either Musabayev or his wife in connection with that medical enterprise.[5] DX E-2, E-3, E-4. There is no evidence, however, that this medical enterprise was related in any way to the movie project.

Ultimately Musabayev was not able to assemble the $800,000 investment that Kinojuz was supposed to make. According to him, an investor who was supposed to provide the $800,000 pulled out after he met Doubinine and Erlikh during their visit to Kazakhstan. Musabayev thus says he sought to renegotiate the deal with Doubinine and Erlikh, and contends that they agreed to accept an investment of $200,000 from Kinojuz.[6] To reflect the revised deal, Musabayev had a new contract drafted that called for Kinojuz's investment to be in that amount, with a promise by IRP to return that $200,000 to Kinojuz by January 1, 2008. PX 1. Erlikh and Doubinine deny that they agreed to any such revision, and Doubinine denies that he signed the revised contract. Mousabayev conceded that Doubinine's signature and the seal of IRP that appeared on the contract had been obtained from Doubinine in July when the original contract was signed because of a fear that the terms of that contract would not conform to the requirements of Kazakhstan law. Thus,

---

[5] The laboratory project apparently led to criminal proceedings against another individual, Daniyar Zhanbulatov, whose relationship to the parties was never made clear. See discussion at footnote 8, *infra*.

[6] Musabayev testified that discussions about this matter took place in meetings with Doubinine and Erlikh in Kazakhstan in November 2007, but they deny being in Kazakhstan at that time. Erlikh's passport confirms that he was in Kazakhstan earlier in 2007, but show no signs of travel to or from Kazakhstan during the last months of 2007 or any time in 2008. DX H.

according to Musabayev, both Musabayev and Doubinine had affixed additional seals and signatures on blank pages that could be appended to any revised contract that was necessary.

Whether or not the agreement was in fact renegotiated, on behalf of Kinojuz Musabayev made a wire transfer of $199,980 to IRP's account at JP Morgan Chase bank in New York.[7] He forwarded the money in the belief that it would be used by Erlikh to generate additional funds to invest in the movie project. The money arrived on December 5, 2007. During the ensuing two months, Erlikh withdrew or expended all of the funds that had been transferred. Except for $15,000 which he paid to Doubinine, supposedly to reimburse him for travel expenses related to his trips to Kazakhstan to work on the movie, none of the funds withdrawn or otherwise expended by Erlikh were used for any purpose related to the movie. Rather, the funds were use for personal purchases or to repay debts Erlikh owed to others.

Doubinine returned to Kazakhstan in February 2008 and met with Musabayev at that point to discuss the movie project. They met several times in late February and early March, and Doubinine eventually told Musabayev that before IRP would return the money Musabayev had transferred, the humanitarian goods that had been mentioned in earlier discussions would have to be sold. He said that Erlikh expected Musabayev to make arrangements to sell the goods. Musabayev denied any responsibility to do so, but said he would make efforts to find a buyer. He also told Doubinine that another individual, Berik Bektay, would be producing the movie and arranged for Doubinine to meet with him.

The meeting between Bektay and Doubinine did not go well. Bektay, who had previously invested in some of the movies produced by Musabayev, was well-schooled in banking and finance, having been trained in the United States at the law firm of Milbank Tweed and at the New York Stock Exchange. He had also served as president of the first stock exchange opened in Kazakhstan in 1991 following the fall of the U.S.S.R. He met with Doubinine and two others who had been involved in the movie in late March or early April at a café in Shymkent. Although Doubinine assured Bektay that the money that had been

---

[7] A transfer fee of $20 was apparently deducted from the transfer.

transferred to IRP was still in IRP's account, he was otherwise unable to provide an explanation for the funds, and Bektay asked to see the company's records. He also inquired about the legitimacy of the merchandise that Erlikh was offering for sale. His questions angered Doubinine, who made statements described by Bektay as "ominous," and the meeting ended.

Bektay reported back to Musabayev and advised him to sever his relationship with Doubinine and his associates. As Musabayev wished to discuss the matter with Doubinine directly, he and Bektay met with Doubinine and his associates later in the day at the train station before they left to return to Almaty where Doubinine was staying. Matters were not resolved, however, and Doubinine made "nuanced" threats, mentioning that he had connections with "serious" people and that Erlikh would deal with him.

Over the ensuing months, Musabayev had sporadic communications with Doubinine and met with him once at Doubinine's apartment in Almaty. Doubinine apologized for his conduct at the train station, and made vague promises about returning the money Musabayev had provided to IRP. In various telephone conversations Doubinine assured him that the $200,000 was safe and would be repaid.

In November 2008, matters began to take a darker turn. Doubinine met with Musabayev at the latter's home in Shymkent, along with an individual named Daniyar Zhanbulatov and another individual who apparently described himself as an associate of a criminal organization. They discussed monetary matters, and Zhanbulatov apparently promised to make good on Doubinine's promise to return the $200,000 investment Kinojuz had made.[8] After Doubinine left to return to Almaty, however, Zhanbulatov said he would

_____

[8]Zhanbulatov's relationship to Musabayev, Doubinine, and Erlikh was never clarified. His name appears in the amended contract Musabayev drafted, where he is described as the "financial director" of the movie. Musabayev says he gave Zhanbulatov that position at Doubinine's request in order to give Zhanbulatov a basis for seeking a visa to travel to the United States, but that no such visa was ever obtained. Zhanbulatov was also identified by Musabayev as the principal of the insurance company that was supposedly insuring Kinojuz's investment, and during the meeting he told Musabayev that his $200,000 would be returned to him by February 2009. Within a day, however, Zhanbulatov reneged on his promise saying his obligation was to Doubinine, not to Musabayev. Apparently Zhanbulatov has since been convicted of crimes in Kazakhstan related in

not be repaying the $200,000. Upon being advised of Zhanbulatov's change of heart, Doubinine invited Musabayev to meet with him in Almaty and Musabayev traveled there immediately. According to Musabayev, upon his arrival Doubinine told him he would be meeting with an individual named Usken Makhametkulov.[9] The meeting did not occur, however, as Makhametkulov did not appear as scheduled. But some time later the same day, Musabayev received a phone call from Makhametkulov, made from a telephone with a number Musabayev recognized to be Doubinine's. Makhametkulov identified himself as a member of organized crime and told Musabayev that he still owed Doubinine $600,000, apparently referring to the balance of the investment Kinojuz had agreed to make in the original contract. He made a threat on Musabayev's life, saying that Musabayev would not leave Almaty if he did not come to Doubinine's apartment for a meeting.

Both Musabayev and Bektay testified that Bektay then spoke with Makhametkulov by telephone and invited him to meet with them at Bektay's home. Makhametkulov agreed, but never showed. As a result, Musabayev and Bektay decided to lodge a complaint with the police. They both testified that they spoke to a police investigator who told them that Makhametkulov was known to the police as a member of organized crime, but that the police could do nothing as no criminal conduct had yet occurred. According to Bektay, the investigator advised them to let the police know in advance if there was to be a further meeting with Makhametkulov.[10]

After Musabayev returned to Shymkent, he continued to receive threatening telephone calls from Makhametkulov. Several months later, in late January or early February of 2009, Musabayev met with Doubinine in Almaty. The meeting, which took place in

---

some way to dealings with Erlikh. See DX E-2, E-4.

[9]The testimony given by Doubinine concerning his relationship to Makhametkulov was confusing and evasive. The name "Makhametkulov" appears in the time line he prepared as a person who would be providing some services in connection with the movie. See DX C. Those references are to an "O. Makhametkulov." The person who was supposed to meet with Musabayev was Usken Makhametkulov. Doubinine suggested that the two were father and son.

[10]The plaintiff offered no documentary evidence to corroborate this complaint to the police.

Doubinine's apartment, was attended by a number of other men including the man who had attended the previous meeting in November, and Musabayev took most of the men to be members of organized crime. Makhametkulov himself, however, was not among those present. The meeting centered on the $600,000 that Doubinine said Musabayev owed for the merchandise that Erlikh had sent to Kazakhstan. Musabayev denied owing any money, insisting instead that Erlikh and Doubinine owed him the $200,000 Kinojuz had provided to IRP a year earlier.

That meeting apparently marked the last time that Musabayev met with Doubinine or any of Doubinine's associates. He says he periodically communicated with Doubinine by telephone and by e-mail with both Doubinine and Erlikh. He also testified that he continued to receive threatening telephone calls every three months or so from Makhametkulov, who said that either Musabayev or his family might suffer if he did not pay the money he owed to Doubinine. He further asserted that Erlikh threatened him over the phone as well, but did not elaborate on what the nature of the threat was. The plaintiff offered no documents or telephone records to substantiate any of those communications.

Several e-mail communications between Erlikh and Musabayev in 2010, introduced by the defendants, provide some insight into the matters in dispute between them. In February of 2010, Musabayev wrote Erlikh in an effort to obtain information for a detective investigating Erlikh's dealings with Daniyar Zhanbulatov. DX E-2.[11] The questions sought information about how Erlikh came to know Zhanbulatov, the nature of his dealings with Zhanbulatov, and whether merchandise he sent to Zhanbulatov was properly entered into Kazakhstan. In September of 2010, Musabayev sent two e-mails to Erlikh discussing the laboratory and medical enterprises that he and Erlikh were apparently involved in together, and seeking to work out a solution to the difficulties that were being encountered. DX E-3, E-4. In those e-mails, Musabayev seeks to clarify that the money he had sent to IRP was

---

[11]DX E-2 is an e-mail addressed to Erlikh by Musabayev posing questions. It appears that Erlikh typed responses to the questions into his copy of the e-mail, but there is no evidence that he actually transmitted the responses to Musabayev.

solely for the production of the movie. DX E-4. Erlikh's responses to those e-mails, if any, were not introduced in evidence.

Eventually, when the funds were never returned Musabayev filed the instant action in January 2011. He testified that shortly after the lawsuit was filed he received yet another threatening phone call from Makhametkulov, who urged him to withdraw the suit. He said he received a similar phone call from Doubinine, who told Musabayev to think hard about what he was doing.

In November 2011, Musabayev's son was assaulted and suffered very serious head injuries. The assault occurred at a wedding celebration for one of his son's friends. Apparently, his son was invited outside of the wedding venue and was attacked, but there were no witnesses to the beating and he himself could neither identify his assailant nor remember anything about the event. He was treated in the emergency room of a local hospital whose discharge summary the following day listed, among other injuries, a comminuted fracture of the frontal lobe of the brain. According to Musabayev, his son was in a coma for months and remained in the hospital for two years.[12] The plaintiff offered no records to substantiate those matters, however. Nor did Musabayev offer any evidence to support his testimony that he spent $500,000 for medical treatment.

Within two days after the assault on his son, Musabayev received a phone call from an individual who said he was calling on behalf of Makhametkulov. The individual asked if Musabayev "understood something," which Musabayev took to mean that Doubinine and Erlikh had contracted to have his son beaten. There is no evidence that Musabayev reported this phone call to the police.

The original complaint was filed in January 2011, followed by the amended complaint which was filed on December 18, 2012. The amended complaint asserts claims for civil

_____

[12]Musabayev gave conflicting testimony on the state of his son's recovery, testifying at one point that his son was healthy and working, Tr. Dec. 9, 2014 at 40, and at another that his son would not be able to work until the end of 2016 at the earliest, Tr. Dec. 10, 2014 at 16. His testimony also differs markedly from the allegations of the amended complaint, which asserts that Musabayev's son was in the hospital for several weeks, not two years, and was unconscious for several days rather than four months.

RICO, conversion, money had and received, fraudulent conveyances, fraud, misrepresentation, civil conspiracy, unjust enrichment, piercing the corporate veil, defamation, and damage to business reputation. The complaint also seeks a declaratory judgment that Kinojuz owes no contractual or other obligations to Erlikh or IRP.

## CONCLUSIONS OF LAW

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 as it involves an action between a citizen of a foreign country as plaintiff and citizens of the United States as defendants.[13]

As an initial matter, with the possible exception of Berik Bektay, the credibility of all of the witnesses who testified at the trial is questionable to varying degrees. The defendant Erlikh was convicted of a multi-million dollar tax fraud and money laundering scheme and was sentenced to a nine-year term of imprisonment. That alone calls any testimony he offered into question. The defendant Doubinine gave inconsistent and evasive testimony, particularly about his relationship with Makhametkulov, and his demeanor on the witness stand gave the court little reason to rely on his testimony. Musabayev too gave inconsistent testimony about several matters including the injuries sustained by his son. In addition, despite numerous references in his testimony to e-mail and telephonic communications with the defendants, he offered not a single e-mail or telephone record to corroborate that testimony. Accordingly, in reaching the decisions below the court relies only on admissions

---

[13]As there was no evidence to establish that the defendant Doubinine was a United States citizen when this action was filed, this conclusion rests on a determination that, for purposes of diversity jurisdiction, a lawful permanent resident of the United States is considered a citizen of the state in which he or she is domiciled. At the time this action was filed in January 2011, the diversity jurisdiction statute contained a provision that specifically so stated. That provision was subsequently eliminated. The court recognizes that, as carefully and cogently explained by Judge Garaufis in *H.K. Huilin Int'l Trade Co. v. Kevin Multiline Polymer Inc.*, 907 F. Supp. 2d 284 (E.D.N.Y. 2012), there was a split in this Circuit as to whether that provision afforded subject matter jurisdiction to cases in which a non-resident alien plaintiff sued multiple defendants, one of whom was a lawful resident alien. The court opts to follow those courts that have exercised jurisdiction in situations like that presented here, particularly since, although it was not pleaded, the court would also have federal question jurisdiction pursuant to 28 U.S.C. § 1331 by virtue of the plaintiff's RICO claim.

found in the pleadings and on evidence that has been corroborated in some manner.  In the discussion that follows the court addresses each of the claims for relief made by the plaintiff.

### *Defamation, Damage to Business Reputation, Piercing the Corporate Veil, Civil Conspiracy*

Addressed first are the claims for which the court finds no support in the record or which no basis in the law.  The plaintiff has offered no evidence that he has suffered any damage to his personal or business reputation at the hands of the defendants.  The claims for defamation and damage to business reputation must therefore be dismissed.  Nor was any evidence offered from which the court could determine to pierce the corporate veil and relief for that claim is therefore denied as well.  The claim for civil conspiracy is dismissed as civil conspiracy is not an independent tort under New York law.  *Shared Commc'ns Servs. of ESR, Inc. v. Goldman Sachs & Co.*, 23 A.D.3d 162, 163, 803 N.Y.S.2d 512, 513 (1st Dep't 2005) (citing *Bell v. Alden Owners*, 299 A.D.2d 207, 209, 750 N.Y.S.2d 27 (1st Dep't 2002), *leave to appeal denied*, 100 N.Y.2d 506 (2003).

### *Conversion*

"To establish a cause of action to recover damages for conversion, a plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights."  *Nat'l Ctr. for Crisis Mgmt., Inc. v. Lerner*, 91 A.D.3d 920, 920-21, 938 N.Y.S.2d 138, 138-39 (2nd Dep't 2012) (quoting *Cusack v. American Defense Sys., Inc.*, 86 A.D.3d 586, 587, 927 N.Y.S.2d 381, 383 (2nd Dep't 2011); *accord, State v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 259 (2002).  Either tangible personal property or a specific fund of money must be involved.  *Batsidis v. Batsidis*, 9 A.D.3d 342, 343, 778 N.Y.S.2d 913, 913 (2nd Dep't 2004); *accord*, *Independence Discount Corp. v. Bressner*, 47 A.D.2d 756, 757, 365 N.Y.S.2d 44, 46 (2nd Dep't 1975).

The plaintiff's conversion claim here rests on IRP's use of the funds the plaintiff transferred to IRP for purposes other than the movie project.  The claim fails because Kinojuz voluntarily provided those funds to IRP and thus no longer enjoyed either ownership or a superior right of possession of the funds.  The defendant's dominion over

the funds was specifically authorized by the plaintiff. That the defendant misused the funds may give rise to a claim for fraud or breach of contract, but not a claim for conversion.

### Fraud and Misrepresentation

Although pleaded as separate counts, the plaintiff's claims for fraud and misrepresentation are essentially the same and are therefore considered together. Both claims rest on allegations that the defendants Erlikh and Doubinine made misrepresentations about their ability to raise money to invest in the movie project in order to induce the plaintiff to transfer $200,000 to IRP. In this context, claims for fraudulent misrepresentation require the plaintiff to prove (1) that the defendants made a material false representation, (2) that the defendants intended to defraud the plaintiff thereby, (3) that the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of its reliance. *E.g., J.A.O. Acquisition Corp. v. Stavitsky*, 18 A.D.3d 389, 390–91, 795 N.Y.S.2d 569, 570–71 (2005); *Sears v. First Pioneer Farm Credit, ACA*, 46 A.D.3d 1282, 1285, 850 N.Y.S.2d 219, 223 (2007); *see Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 406–07, 151 N.E.2d 833, 835 (1958). The proof must be by clear and convincing evidence. *Simcuski v. Saeli*, 44 N.Y.2d 442, 452–53 (1978).

The plaintiff has satisfied the above elements of their claim for fraudulent misrepresentations. The defendants Doubinine and Erlikh made a series of false representations about Erlikh's ability to raise money for the movie project in order to induce Musabayev, on behalf of Kinojuz, to transfer money to IRP. They convinced Musabayev that the money would be used to further that goal. In reliance on those representations, the plaintiff transferred $200,000 to IRP in December of 2007. Instead of using the funds to further the movie project, Erlikh spent the money on a number of unrelated items, including a vacation trip to the Dominican Republic, a host of purchases of personal items and to pay off debts entirely unrelated to the movie. Neither of the defendants have ever returned any of the money to the plaintiff who has thus suffered a total loss of the $200,000 for which the plaintiff is entitled to a recovery.

<u>*Money Had and Received and Unjust Enrichment*</u>

As presented here, the plaintiff's claims for unjust enrichment and for money had and received are indistinguishable from one another. To prove a claim for unjust enrichment under New York law, the "plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (quoting *Citibank, N.A. v Walker*, 12 AD3d 480, 481 (2d Dep't 2004)) (internal quotations omitted). To prove a claim for money had and received, the plaintiff must show that "(1) the defendant received money belonging to the plaintiff, (2) the defendant benefitted from receipt of the money, and (3) under principles of equity and good conscience, the defendant should not be permitted to keep the money." *Lebovits v. Bassman*, 120 A.D.3d 1198, 1199-2000, 992 N.Y.S.2d 316, 318-19 (2014) (quoting *Goel v. Ramachandran*, 111 A.D.3d 783, 790, 975 N.Y.S.2d 428, 436 (2nd Dep't 2013).

The plaintiff has satisfied the elements of both claims. The plaintiff provided money to the defendant IRP. Both Erlikh and Doubinine benefitted from receipt of the money as each received and used a portion of the funds transferred to IRP by the plaintiff. Because the plaintiff transferred the money on the mistaken belief, induced by the misrepresentations of Erlikh and Doubinine, that the money would be used to further the movie project, equity and good conscience requires that the defendants return the money to the plaintiff. Accordingly the plaintiff is entitled to recover $200,000 from them.

<u>*RICO*</u>

Read liberally, the plaintiff's amended complaint asserts claims under subsections 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"). To establish a violation of subsection 1962(c), the plaintiff must show that the defendants conducted, or participated in the conduct, of a RICO enterprise's affairs through a pattern of racketeering activity. *E.g., Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487 (2d Cir. 2014) (citing *Cruz v. FXDirectDealer, LLC (FXDD)*, 720 F.3d 115, 120 (2d Cir. 2013). To establish a violation of subsection 1962(d), the plaintiff must show that

the defendants agreed with each other to commit a substantive RICO offense. *Id.* (citing *Baisch v. Gallina*, 346 F.3d 366, 376–77 (2d Cir. 2003).

The Supreme Court has explained that under RICO "an enterprise includes any union or group of individuals associated in fact" and that RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944-45 (2009) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981). Such an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* (quoting *Turkette*, 452 U.S. at 583). As defined in RICO, racketeering activity may consist of any of a number of criminal offenses, commonly known as predicates, and a pattern of racketeering activity consists of, inter alia, at least two acts of racketeering activity. *Crawford*, 758 F.3d at 487. "To prove such a 'pattern,' a civil RICO plaintiff also 'must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.'" *Id.* (quoting *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989). The plaintiff may establish the requisite continuity by evidence of "either an 'open-ended' pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (i.e., past criminal conduct "extending over a substantial period of time")." *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995).

The plaintiff alleged that the RICO enterprise here was an association in fact consisting of the defendants IRP, Doubinine and Erlikh. The plaintiff contends that the predicate acts of racketeering activity in which the enterprise engaged included mail and wire fraud, money laundering, receipt and transportation of stolen property, extortion, threat of murder, and obstruction of justice.

Although the plaintiff has adequately proved that the defendants engaged in wire fraud in violation of 18 U.S.C. § 1343, interstate receipt and transportation of property acquired by fraud in violation of 18 U.S.C. § 2314, and multiple instances of money laundering in violation of 18 U.S.C. § 1957, all of which constitute RICO predicates under 18

U.S.C. § 1961(1), the plaintiff has failed to prove the requisite continuity to establish a pattern of racketeering activity. The wire fraud was committed in December 2007 when the plaintiff transmitted the fraudulently obtained funds to IRP by wire transfer from Kazakhstan to the United States. The same conduct constituted transportation of money in foreign commerce in the execution of a fraud. The instances of money laundering occurred in December 2007 and January 2008 as Erlikh engaged in various monetary transactions with those funds. The evidence does not establish, however, that the remaining acts of racketeering alleged by the plaintiff were undertaken in furtherance of the enterprise.

Taking first the acts of extortion about which Musabayev testified, they fail to constitute racketeering acts for two reasons. First and foremost, they do not fall within the definition of racketeering acts under section 1961(1). To constitute a racketeering act within that section, extortion must be committed in violation of state law or in violation of the Hobbs Act, 18 U.S.C. § 1951. *See* 18 U.S.C. § 1961(1). According to Musabayev, all of the acts of extortion were committed on foreign soil by foreigners with no known connection to the United States, and therefore do not constitute violations of the law of any state. Nor do they constitute extortion in violation of the Hobbs Act, because there is no evidence that the extortions had any affect on "commerce" as defined in the Hobbs Act. "Commerce" under the Act means commerce that has some connection to the United States. *See* 18 U.S.C. § 1951(b)(3). As there is no evidence that Kinojuz or Musabayev, at whom the extortions here were aimed, ever engaged in or intended to engage in any commerce in the United States, even a "depletion of assets" theory would not serve to satisfy the commerce element. *See, e.g., Calabrese v. CSC Holdings, Inc.*, 283 F. Supp. 2d 797, 810 (E.D.N.Y. 2003); *see generally United States v. Perrotta*, 313 F.3d 33, 36-40 (2d Cir. 2002); *United States v. Jones*, 30 F.3d 276, 285 (2d Cir. 1994).

Second, and perhaps more importantly, there is insufficient evidence that the extortionate efforts were in furtherance of the enterprise. According to Musabayev, the person at the center of the extortionate efforts was Usken Makhametkulov, who along with associates engaged in various threatening communications with Musabayev. There is no

evidence, however, that Erlikh knew Makhametkulov or any of the other persons alleged to be involved in the extortions.  There is no evidence that he in any way procured any of the extortionate efforts in which they engaged.  There is no evidence that he himself made any extortionate threats to Musabayev.  In fact, Musabayev testified that he had no phone conversations with Erlikh before the lawsuit was filed.  Tr. Dec. 9, 2014 at 33.  Based on the evidence, Erlikh's participation in the enterprise alleged by the plaintiff was limited to his role as a supposed financier for the movie.

There is certainly evidence, albeit disputed, that Doubinine was in some way connected to the extortions about which Musabayev testified.  According to Musabayev, it was Doubinine who tried to arrange a meeting between Musabayev and Makhametkulov, and who invited Musabayev to a meeting at his apartment which included a number of other persons that Musabayev took to be members of organized crime.  In addition, as noted above, Makhametkulov was listed on a time line prepared by Doubinine related to the production of the movie.  See DX C.  Although not proved at trial, there are various allegations in the amended complaint about obligations Doubinine had incurred to Makhametkulov and others whom he purportedly hired for the movie project, and that it was these obligations that led to the efforts at extortion.  Thus, to the extent that extortions actually occurred, and the evidence on that point is not strong,[14] they appear equally likely to have been aimed at furthering a separate scheme contrived by Makhametkulov or by Doubinine, or the two of them acting together, not the enterprise alleged in the amended complaint.

For much the same reasons, the evidence of obstruction of justice offered by the plaintiff is insufficient to establish that the enterprise engaged in a continuing pattern of racketeering activity.  The evidence consisted of two telephone calls Musabayev received,

---

[14]Aside from corroboration by Bektay concerning some "ominous" statements made by Doubinine at a meeting at a railway station, the only evidence concerning the extortionate communications was the uncorroborated testimony of Musabayev.  No records of telephone calls were offered to substantiate that any of the telephone communications attributed to Makhametkulov were actually made.  Nor was a single e-mail between Musabayev and Doubinine introduced that might have disclosed the nature of their communications during this period of time.

one made by Makhametkulov and one made by Doubinine, in which they each urged Musabayev to discontinue the lawsuit that was filed in January 2011. According to Musabayev, Makhametkulov told him he "would be in a worse situation if I do not take my lawsuit back." Tr. Dec. 9, 2014 at 33. In the phone call with Doubinine, Doubinine told him he "needed to think very well about this lawsuit." Neither of those statements are sufficiently threatening to constitute witness tampering that would violate 18 U.S.C. § 1512. Moreover, these efforts to dissuade Musabayev from continuing with the lawsuit are not sufficiently connected to the enterprise because they do not directly implicate IRP and Erlikh. Indeed, by the time the phone calls were made in June or July of 2011, IRP had been dissolved and could not have been part of the enterprise.

Musabayev did provide confused and conflicting testimony about a telephone call he received from Erlikh in March 2012 prior to his appearance at a deposition scheduled in this lawsuit. At one point he said he received the phone call before the litigation commenced. Tr. Dec. 9, 2014 at 34. This was in conflict with his earlier testimony that he did not have a phone conversation with Erlikh before he started the lawsuit. Tr. Dec. 9, 2014 at 33. Later, when again asked about the phone call, he said it occurred in March 2012, after the lawsuit had been commenced. Tr. Dec. 9, 2014 at 41. Initially, he characterized the phone call as threatening, Tr. Dec. 9, 2014 at 34, but when asked what Erlikh said specifically, he testified that "He told me that we have just a regular personal conversation. If not, then I would have serious problems later." Tr. Dec. 9, 2014 at 42. For his part, Erlikh disputes Musabayev's characterization of the telephone call, saying his purpose in making the call was to offer a resolution of the lawsuit. Tr. Dec. 11, 2014 at 122-24. In any event, the statements Musabayev attributed to Erlikh are too ambiguous to constitute witness tampering in violation of 18 U.S.C. § 1512. The court recognizes that this phone call occurred only months after the assault of Musabayev's son, which would make a reference to "serious problems" more ominous. But in the absence of any evidence that Erlikh was himself aware that the assault had occurred, and in view of Erlikh's testimony disputing the nature of the telephone call, the court is unable to conclude that any reference to serious problems, if

those words were actually uttered, was intended to be a threat of physical force aimed at preventing Musabayev from testifying at the deposition.

Finally, the court is unable to conclude that the assault on Musabayev's son in November 2011 constitutes a racketeering act within the meaning of RICO or that it was related to the enterprise. The assault was committed on foreign soil and therefore does not constitute a crime in violation of any state law. Nor, for the reasons stated above, would it constitute a violation of the Hobbs Act.[15] The only connection between the assault and the enterprise is a mysterious telephone call that Musabayev said he received days after the assault from a person purporting to be calling on behalf of Makhametkulov and suggesting that the assault was related to the ongoing extortionate efforts in which Makhametkulov was then engaged. But, as noted above, those extortionate efforts have not been adequately linked to the enterprise alleged here.

Moreover, although the incident as related by Musabayev is most serious, his conflicting testimony about the severity of the injuries, as noted above, gives rise to some doubts both about the incident itself and its purported relationship to the enterprise. No documentary evidence was offered to substantiate the surgery about which Musabayev testified, the years of treatment that his son has supposedly undergone, or the hundreds of thousands of dollars purportedly spent on it. The court also finds it curious that Musabayev apparently never informed the police about the phone call he received, despite the fact that it was directly connected to a supposedly criminal assault. According to the advice given to

_____

[15]In closing argument the plaintiff's attorney suggested that the assault constituted retaliation against a witness in violation of 18 U.S.C. § 1513. The suggestion fails because no testimony had yet occurred which would serve as the basis for any such retaliation. Counsel also suggested that violations of 18 U.S.C. §§ 1958 and 1959 occurred which would serve as predicate acts. Section 1958 prohibits the use of interstate commerce facilities in connection with a murder for hire in violation of the law of any state or of the United States. Aside from the fact that the assault was not sufficiently proved to be connected to the enterprise, to the extent that the assault may have constituted an attempted murder for hire, there is no showing that such a murder would have violated the laws of any state or of the United States as the assault took place in Kazakhstan and there was no evidence that any facilities of interstate commerce were used. Section 1959, which prohibits violent crimes in aid of racketeering activity, is not a predicate act under section 1961(1).

Musabayev by the police investigator to whom he and Bektay reported the first instance of intimidation he says he suffered, the police could not open an investigation until a criminal act had occurred. Now that a potentially criminal act had occurred, if the phone call had been reported to the police, an investigation into the phone call could have been opened which might have yielded evidence linking whoever made it to Makhametkulov, a person supposedly known to the police as a member of organized crime. Given all of these factors, the sparse evidence offered by the plaintiff is simply insufficient to establish that the assault was part of the pattern of racketeering activity alleged here.

The plaintiff is left then only with the racketeering acts directly related to the fraud in obtaining the $200,000 transferred to IRP. These are simply insufficient to meet the "continuity" requirement of RICO. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989); *accord, e.g., First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004) ("this Court has never found a closed-ended pattern where the predicate acts spanned fewer than two years"). Accordingly, the plaintiff has failed to establish his RICO claim.

### *Fraudulent Conveyance*

The plaintiff's claims to set aside fraudulent conveyances proceeds under the Debtor and Creditor Law, N.Y. Debt. & Cred. Law §§ 270-281, under which a creditor may set aside a conveyance "as against any person *except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase*." *Id.* § 278 (emphasis added). Although the plaintiff has identified a number of conveyances made by IRP with the funds obtained from the plaintiff, there is no evidence that any of the conveyances were made without fair consideration or that the persons receiving the funds had any knowledge of the fraud alleged by the plaintiff here. The court therefore has no basis for setting any of the conveyances aside.

<u>*Declaratory Judgment*</u>

The plaintiff seeks a declaratory judgment from the court determining that it "never contracted to buy, obtain, or otherwise accept for selling any merchandise from Erlikh or IRP," and that it never contracted with persons "purportedly hired" by Doubinine. Amended Complaint ¶ 197.

Under the Declaratory Judgment Act, a federal court may "declare the rights and other legal relations" of an interested party in a "case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a). There must exist a "definite, concrete, and substantial" controversy to sustain jurisdiction under the Declaratory Judgment Act, however. *ED Capital, LLC v. Bloomfield Inv. Res. Corp.*, 155 F. Supp. 3d 434, 443-44 (S.D.N.Y. 2016), *aff'd in part and vacated in part on other grounds,* — Fed. Appx. —, No. 16-331-CV, 2016 WL 4499756 (2d Cir. Aug. 26, 2016) (citing *Muller v. Olin Mathieson Chem. Corp.*, 404 F.2d 501, 504 (2d Cir.1968). The analysis is the same as that applicable to the "case or controversy" standard embodied in Article III of the United States Constitution. *Id.* (citing *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002). Moreover, even where jurisdiction exists, federal courts have "unique and substantial discretion" to decline to hear a declaratory judgment action. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).

The only potentially definite, concrete and substantial controversy between the plaintiff and the defendants concerns the question whether the plaintiff contracted with Erlikh to buy, obtain or accept for sale any merchandise delivered to Kazakhstan. Issue was sufficiently joined on that question through the testimony of Musabayev, who said Kinojuz never agreed to do so, and Erlikh, who said that Musabayev owed him money for merchandise he had delivered to him. There is evidence that Erlikh and Musabayev, as distinguished from the plaintiff Kinojuz, were in some manner involved in business dealings that included merchandise of some kind that Erlikh delivered to Kazakhstan. However, the contemporaneous communications between Erlikh and Musabayev corroborate Musabayev's position that those dealings were separate from the movie business of Kinojuz. See DX E-4. Accordingly, Kinojuz is entitled to a declaration that it has no contractual obligations to

Erlikh with respect to any merchandise Erlikh or IRP delivered to Kazakhstan. As Musabayev is not himself a party to this action, the judgment does not extend to any contractual obligations he individually may owe to Erlikh.

*Prejudgment Interest*

Under New York law, prejudgment interest is to be awarded for sums recovered "because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property." N.Y. C.P.L.R. § 5001(a). Recoveries for fraud fall within this section. *See, e.g., Huang v. Sy*, 62 A.D.3d 660, 661-62, 878 N.Y.S.2d 398, 400 (2nd Dep't 2009); *Eighteen Holding Corp. v. Drizin*, 268 A.D.2d 371, 372, 701 N.Y.S.2d 427 (1st Dep't 2000). Interest is at the rate of 9% per annum, N.Y. C.P.L.R. § 5004, and runs from December 5, 2007, the date when the fraudulently obtained funds were transferred, *see* N.Y. C.P.L.R. § 5001(b).

## CONCLUSION

For the foregoing reasons, the plaintiff Kinojuz I.P. is entitled (1) to an award of $200,000 plus prejudgment interest at 9% per annum from December 5, 2007, to be paid jointly and severally by the defendants, and (2) a declaratory judgment that it owes no contractual obligations to the defendant Igor Erlikh relating to any merchandise delivered by Erlikh to Kazakhstan. The clerk is directed to enter judgment accordingly.

**SO ORDERED:**

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated:    Brooklyn, New York
          October 12, 2016

-21-